

NORTHERN DISTRICT OF TEXAS

**FILED**

APR 2 4 2015

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| RICKY L. CARTER, | § | |
| PLAINTIFF, | § | |
| | § | |
| vs. | § | CIVIL NO. 4:14-CV-410-A |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| DEFENDANT. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**
**AND**
**NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions, and Recommendation

of the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

**I.      STATEMENT OF THE CASE**

Plaintiff Ricky Lee Carter ("Carter") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying his claims for a period of disability and disability

insurance benefits ("DIB") under Title II of the Social Security Act ("SSA").  Carter applied for

DIB in February 2011,[1] alleging that his disability began on May 26, 1999.  (Transcript ("Tr.") 9,

114-24.)  After his application for benefits was denied initially and on reconsideration, Carter

requested a hearing before an administrative law judge ("ALJ").  (Tr. 9, 76-78.)  The ALJ held a

hearing on February 7, 2013, and he issued an unfavorable decision on July 25, 2013.  (Tr. 9-61.)

---

[1] Plaintiff also filed an application for supplemental security income following the DIB hearing before the
Administrative Law Judge ("ALJ").  (Tr. 9).  However, the ALJ decided to not consolidate the claims.  (Tr. 9-10).

On April 8, 2014, the Appeals Council denied Carter's request for review, leaving the ALJ's decision as the final decision of the Commissioner in his case. (Tr. 1-3.) Carter subsequently filed this civil action seeking review of the ALJ's decision.

## II.    STANDARD OF REVIEW

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and numerous regulatory provisions. *See* 20 C.F.R. Pt. 404. The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the

2

claimant to show he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

### III.   ISSUES

In his brief, Carter presents the following issues:

1.   Whether the ALJ's residual functional capacity ("RFC") determination is supported by substantial evidence; and

2.   Whether the ALJ erred in his duty to develop the record by failing to order a consultative examination.

(Plaintiff's Brief ("Pl.'s Br.") at 1, 3-9.)

### IV.   ALJ DECISION

In his July 25, 2013 decision, the ALJ found that Carter met the insured status requirements of the SSA through March 31, 2005, and had not engaged in any substantial gainful

activity since May 26, 1999, the alleged date of Carter's onset of his disability. (Tr. 12.) The

ALJ further found that Carter suffered from the following severe combination of impairments:

> a history of necrotizing fasciitis involving the anterior abdominal wall, perineum, and left side of the scrotum with subsequent resection and plastic surgery repair using myocutaneous flaps from the lower extremities and extensive skin grafting, resulting in sensory loss and dysfunction, and significant disfigurement; status-post left orchiectomy[2]; and erectile dysfunction.[3]

(Tr. 12 (footnotes added).)   Next, the ALJ held that none of Carter's impairments, or

combination of impairments, met or equaled the severity of any impairments in the Listing of

Impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13.)  In making such a

determination, the ALJ stated:

> The objective medical evidence fails to establish that Mr. Carter's impairments, either individually or in combination, met or equaled the requirements of section 1.08 or 11.14, or any other section, of the *Listing of Impairments*, as it fails to establish the required severity. In reaching this finding, I considered the opinions of Dr. Goldstein, who testified at the hearing. In this case, I gave very significant weight to those opinions because they were consistent with and supported by the overall evidence, particularly the objective medical evidence.
>
> In September and December 2011 the State agency physicians who reviewed Mr. Carter's case at the initial and reconsideration administrative levels issued technical denials because there was insufficient evidence regarding Mr. Carter's condition prior to the expiration of his insured status on March 31, 2005 (Exhibits 2F and 3F). I did not give significant weight to those opinions, as there clearly was some medical evidence on which to base a decision.

(Tr. 13 (emphasis omitted).)  As to Carter's RFC, the ALJ stated:

> Prior to the expiration of his insured status, Mr. Carter retained the following residual functional capacity: Lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; sit throughout an 8-hour workday; stand and walk (individually or in combination) 2 hours in an 8-hour workday; and

---

[2] A left orchiectomy is the removal of the left testicle.  (Tr. 37.)

[3] The ALJ emphasized that he found Carter had a severe combination of impairments, not that each impairment was individually severe.  (Tr. 12.)

4

> otherwise perform the full range of sedentary work,[4] except: he could not climb
> ramps, stairs, ladders, scaffolds, or ropes, kneel, crouch, or crawl; and he could
> only occasionally balance and stoop. Mr. Carter could work full-time at this
> residual functional capacity on a sustained basis and maintain employment for an
> indefinite period of time.

(Tr. 13 (footnote added) (citations omitted).)   Next, the ALJ found that Carter was not able to

perform his past relevant work as a driver/dock man given that Carter "could perform no more

than sedentary work prior to the expiration of his insured status." (Tr. 17.)   However, the ALJ

opined that, prior to March 31, 2005, Carter was able to perform jobs that existed in significant

numbers in the national economy.   Consequently, the ALJ concluded that Carter was not

disabled between May 26, 1999 and March 31, 2005, when Carter's insured status for disability

expired. (Tr. 17-19.)

## V.   DISCUSSION

### A.  Substantial Evidence

To begin with, Carter argues that the ALJ's RFC determination is not supported by

substantial evidence.  (Pl.'s Br. at 1, 4-7.)   Specifically, Carter argues that the ALJ erred in

stating that he was giving the opinion of Steven Goldstein, M.D. ("Dr. Goldstein"), significant

weight but then failing to incorporate critical portions of Dr. Goldstein's findings, which was

"the only medical opinion of record."  (Pl.'s Br. at 5-7.)   Carter argues that Dr. Goldstein's

medical opinions support a finding, at the very least, that Carter was disabled from May 26, 1999

---

[4] Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking and standing is often necessary in carrying
> out job duties.  Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are not.

20 C.F.R. § 404.1567(a).  To perform the full range of sedentary work, an individual must be able to remain in a
seated position for approximately six hours of an eight-hour workday and stand and walk for approximately two
hours of an eight-hour day. *See* Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *6 (S.S.A. July 2,
1996).

to August 9, 2001, "the date in which [Carter] underwent the only examination of record and was assessed with a 51% whole person impairment." (Pl.'s Br. at 7 (citing Tr. 28, 31, 244-48).) Finally, Carter argues that the ALJ erred by relying on Carter's testimony regarding his functional level at the time of the February 7, 2013 hearing because the relevant period under review was May 26, 1999 to March 31, 2005. (Pl.'s Br. at 6-7.)

RFC is what an individual can still do despite his limitations.[5]  SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.*; *see Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. SSR 96-8p, 1996 WL 374184, at *2. RFC is not the least an individual can do but the most. *Id.* The RFC is a function-by-function assessment, with both exertional and nonexertional[6] factors to be considered, and is based upon all of the relevant evidence in the case record. *Id.* at *3-6. The responsibility for determining the claimant's RFC lies with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ must discuss the claimant's ability to perform sustained work activity on a regular and continuing basis and resolve any inconsistencies in the evidence. SSR 96-8p, 1996 WL 374184, at *7.

In making the RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with objective

---

[5] The Commissioner's analysis at step four and five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from step three to step four. *Id.*

[6] Exertional capacity addresses an individual's ability "to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." SSR 96-8p, 1996 WL 374184, at *5. Each function must be considered separately, but the final RFC assessment may combine activities. *Id.* Nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength," including mental limitations. *Id.* at *6.

medical evidence and other evidence. *See* 20 C.F.R. § 416.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ must also consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *Id.* The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security ruling also cautions that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7C, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (superseded only to the extent the SSR discusses the former procedures used to determine disability in children). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record."). In reviewing the ALJ's decision, a finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Boyd*, 239 F.3d at 704.

As set forth above, the ALJ found that, prior to the expiration of his insured status on March 31, 2005, Carter had the RFC to:

> Lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; sit throughout an 8-hour workday; stand and walk (individually or in combination) 2 hours in an 8-hour workday; and otherwise perform the full range of sedentary work, except: he could not climb ramps, stairs, ladders, scaffolds, or ropes, kneel, crouch, or crawl; and he could only occasionally balance and stoop.

(Tr. 13 (emphasis omitted).) In making this determination, the ALJ reviewed, *inter alia*, the following evidence: (1) Carter's testimony regarding his symptoms, in which Carter stated that (a) he could lift up to thirty-five pounds a few times, stand one hour "most of the time," walk one hour, sit without problem, touch his toes bending from the waist, kneel by using his hands to

assist, and roll over to get himself back up, and (b) his condition was the same from 2001 through the expiration of his insured status on March 31, 2005 (Tr. 15, 32-56); (2) treatment notes from the Smart Institute, dated June 20, 2000,[7] which stated that (a) Carter's strength in his upper and lower extremities was 5/5 throughout, "except for mildly decreased strength in his quadriceps (4/5 on the left and 4+/5 on the right)," (b) Carter had scars and diminished sensation over his abdominal scar, (c) Carter was "able to walk on his heels and toes, rise from a crouched position, perform tandem gait, and flex and touch his toes," and (d) Carter's abduction was "within normal limits" (Tr. 16; *see* Tr. 250-51); (3) records indicating that Phillip E. Cohen, D.O. ("Dr. Cohen"),[8] treated Carter during the worker's compensation claim (Tr. 15-16; *see* Tr. 257-59); (4) medical records from a workers' compensation designated doctor evaluation by Christopher Tucker, D.O. ("Dr. Tucker"), dated August 9, 2001, in which Dr. Tucker, *inter alia*, (a) noted that Carter was alert, pleasant, cooperative, and "in no distress," that Carter had "well-healed incisions" with "extensive scar tissue," and that Carter had normal strength throughout his lower extremities "except for his knee extensor via the quadriceps muscles, which was slightly reduced (4/5) bilaterally," (b) found that Carter had reached a maximum medical improvement as of May 31, 2001, and (c) assessed a combined whole personal impairment of 51% under the AMA Guides to Evaluation of Permanent Impairment, and (d) noted that Carter, on June 20, 2000, "received a whole person impairment rating of 43%, based on erectile dysfunction, loss of sensation over the abdominal wall, loss of strength in the lower extremities, disfigurement and scar formation of the abdominal wall, and loss of the left testicle" (Tr. 16; *see* Tr. 226, 296-99);

---

[7] The ALJ stated that these records were from July 2000, which appears to be a typographical error. (Tr. 16.)

[8] The ALJ referred to Dr. Cohen as "Dr. Cohn." (Tr. 15.) This appears to be a typographical error. Although not specifically referenced by the ALJ, there is a letter in the transcript from Dr. Cohen, dated December 5, 2000, the same date that Dr. Cohen examined Carter, in which Dr. Cohen stated, *inter alia*, that (a) Carter's "overall total body impairment [was] 43%," and (b) Carter had reached the maximum medical improvement as of December 5, 2000. (Tr. 259; *see* Tr. 257.)

and (5) the opinion testimony of Medical Expert Dr. Goldstein, who testified at the hearing before the ALJ (Tr. 13-17; *see* Tr. 27-32).

Carter argues that the ALJ erred by failing to adopt important portions of Dr. Goldstein's opinion testimony regarding his RFC from May 26, 1999 to August 2001, despite Dr. Goldstein's testimony being the only medical opinion of record and despite the ALJ's finding that he had given "significant weight" to Dr. Goldstein's testimony. (Pl.'s Br. at 7.) As to Dr. Goldstein's testimony the ALJ stated, "The only medical records Dr. Goldstein had to go by was Exhibit 1F, which is dated August 9, 2001."[9] In addition, the ALJ noted that, "[r]egarding Mr. Carter's condition prior thereto, Dr. Goldstein can only go by the medical history that was taken that day." (Tr. 13.) In addition, the ALJ commented that, although Dr. Goldstein testified that Carter could not bend or stoop to pick up a piece of paper off the floor, the August 2001 exam, which was all Dr. Goldstein had to go by, did not test whether Carter could bend or stoop, or do a combination of the two, in order to pick something up. (Tr. 13-14.) For this reason, the ALJ disregarded Dr. Goldstein's assessment that, from the date of the injury until August 2001, Carter *probably* was less than sedentary, because "this opinion was not supported at all." (Tr. 13.) Ultimately, the ALJ concluded that:

> [N]either the objective medical evidence or any reasonable inference therefrom, nor any other credible evidence, establishes Mr. Carter's ability to function prior to the expiration of his insured status was so severely impaired as to preclude the performance of sedentary work with the above-stated limitations. The physical examinations in July 2000 and August 2001, Dr. Goldstein's testimony, and Mr. Carter's testimony support that Mr. Carter was able to perform sedentary work with the above-stated restrictions.

(Tr. 17.)

---

[9] This is the evaluation from Dr. Tucker.

The ALJ's determination is supported by Dr. Goldstein's testimony at the hearing in which Dr. Goldstein stated:

> [I]t's very clear that [Carter] suffered a worker's compensation injury and was clearly less than sedentary from the date of the injury of 5/26 of '09. From the history that was taken, he was very sick. He wound up in the respirator for his infection. He was comatose for a while. It's obvious he would be less than sedentary. . . . It was an acute illness, but he was very sick for a long time. *And of course as you know, the only available record that I have to go by is on Exhibit 1F that's dated August 9th of 2001. So what his condition was before August 9th, 2001, I can just go by the history that was taken on that day. I don't have any objective evidence of that, but I can see that at that time there was some weakness in the quadriceps muscle.* He had a lot of scarring. He had damage to the perineal area, and the scrotum, and so forth. But I can see that his gait was said to be normal. *So I would say as of August 9th of 2001, looking at this, he would be at a sedentary level of activities as best as I could tell. Again, I have very little medical records to go by, and I just have to do the best I can.*

(Tr. 28-29 (emphasis added).)  When the ALJ asked Dr. Goldstein if Carter could occasionally stoop or crouch to pick up a paper or other object off the floor, Dr. Goldstein stated:

> I don't have enough information to know what the -- his range of motion is. He does have a lot of scarring. So I would err on the side based on the information that I have of saying that he could not do it. *He would have to use a grabber. But that may not be true, and I really don't have the information to know for certain. . . .* I don't know with that scarring [in the groin and genital area] if he is able to bend down or not. *He may be. He may not be. The examination did not test for that.*

(Tr. 30 (emphasis added).)  As to Carter's ability to perform sedentary work from May 1999 to August 2001, Dr. Goldstein stated that:

> *The history was not that detailed enough for me to say.* He certainly I would say August 9th of 2001. There clearly was a period from the date of the injury until 2001 that I would say he would be less than sedentary. *But again I just have very little information to go by on when he hadn't.*

(Tr. 31 (emphasis added).)  Finally, the ALJ asked Dr. Goldstein whether he could tell with reasonable medical certainty whether Carter was less than sedentary for twelve or more months. Dr. Goldstein replied, "I would say more than likely from the extent of his injuries, I would say

yes." (Tr. 31.) However, as noted above, the ALJ specifically pointed out that Dr. Goldstein only had the August 9, 2001 medical record on which to base his opinion and that "[t]here is no objective evidence prior thereto." (Tr. 13.) The ALJ noted that, "[a]s of August 9, 2001, Mr. Carter would be at a sedentary level of activity." (Tr. 13.)

As to Carter's positional changes—his ability to balance, stoop, kneel, crouch, or crawl—the ALJ instead focused his analysis on Carter's testimony, which the ALJ found to "support[] the restrictions regarding positional changes and postural activities in the above [RFC] finding."[10] (Tr. 14.) Specifically, Carter testified at the hearing that:

> [ALJ]: Okay. Now after this worker's comp evaluation in August of 2001 by a Dr. Tucker, did you see any improvement in your condition and your functioning? For example, the ability to lift, carry anything at all?
>
> [Carter]: No sir. *It's pretty much the same now as then.*
>
> [ALJ]: How much weight can you lift in reasonable comfort now?
>
> [Carter]: There's – they [sic] saying it changes with frequency due to the muscle flap. If just like for a few times of lifting, about 30 to 35 pounds. That right at approximately the 35 pound is when the sides of the muscle flaps draw tense, and you tend to release whatever you're lifting. And so then I mean in other words, that's about where you lift at. And they say to watch -- they informed me that I should pay attention to that because if I was in motion and lifted over that, I could end up snapping my back because I don't have anything to protect it with that abdominal gone.
>
> [ALJ]: Did your doctors at any time place a limit on you as far as lifting?
>
> [Carter]: About 30 to 35 pounds.
>
> [ALJ]: Was that Dr. Cohen who did that or somebody else who gave you that limit?
>
> [Carter]: That was the Smart Institute which was [sic] done some of the rehab work. . . .

---

[10] In making the RFC determination, the ALJ may consider descriptions and observations of the claimant's limitations from his or her impairment(s) provided by the claimant, the claimant's family, neighbors, friends, or other persons. 20 C.F.R. § 404.1545(a)(3); *see also* 20 C.F.R. § 404.1529(a).

. . . .

[ALJ]: How well can you stand and walk in reasonable comfort at one time?

[Carter]: Now there again, it can depend on like weather conditions, how much you're -- you've walked the prior day. It all -- it's a consistent pull where the muscle flap is tied in at. It depends on how much you lifted the day before. I mean just like after two or three days rest, and then you get up the next day. You're usually pretty good for several hours that day.

[ALJ]: Can you stand for example one hour at a time in reasonable comfort?

[Carter]: Yes, sir, most of the time I would.

[ALJ]: Could you walk for one hour in reasonable comfort?

[Carter]: Yes, sir.

[ALJ]: Do you have any problems with sitting?

[Carter]: No, sir.

[ALJ]: How about climbing up stairs? Is that a problem?

[Carter]: Yes, sir. That creates a significant pull and balance sometimes. There again, depending on how much activity you've had on a prior day it can change it to a day or two down the line because --

[ALJ]: Can you climb up –

[Carter]: -- if --

[ALJ]: Excuse me. Can you climb a flight of stairs?

[Carter]: I try to avoid them, but I mean I can -- I have. I was encouraged just like the other doctor had stated that you should try to avoid them and stay off of ladders other than maybe one or two steps. So I try to pay attention to that as well. And I -- you were talking about the bending and stooping. I know you didn't ask this question, but –

[ALJ]: I'm getting to it.

[Carter]: If I start down, again, I – after a certain point of going down, I mean I -- most of the time I just drop all the way down. And I can't get back up without rolling over, kneel, push your hands up. You can't just squat yourself up without --

[ALJ]: Okay.

[Carter]: -- the abdominal muscles.

[ALJ]: Okay.  So if you were to bend at the waist, the bending or stooping, can you reach down and get a shoe or other object off the floor?

[Carter]: Yes.

[ALJ]: But you're telling me --

[Carter]: But if you stoop -- if I squat down, I'll after a certain distance you [sic] drop to the floor.  But I can like touch my toes to give you an example.

[ALJ]: Okay. So if you bend at the waist, you can reach down --

[Carter]: And touch my toes, correct.

[ALJ]: Touch toes.  But if you squat or crouch – I usually say like crouch like an Indian –

[Carter]: Right.  Then you go off – I'll go onto the floor with my bottom.

[ALJ]: Okay.  Can you kneel down?

[Carter]: Well working with your hands down, yes.  There again, trying to simply kneel or do like you tend to drop after you get to a certain degree.

(Tr. 48-51 (emphasis added).)  Although Carter was testifying as to what he could do at the time of the hearing, he reiterated that his abilities had not changed since 2001:

[ALJ]: Okay.  Now again I was asking what you can do now.  But you also said your condition has pretty much remained the same.  Is this the same condition you had back in 2001 at the time of your --

[Carter]: Maximum medical improvement, yes, sir.

[ALJ]: So it was the same back then?

[Carter]: Right.

(Tr. 52.)  After reflecting on this testimony, the ALJ, in his decision, stated:

[A]t the hearing, I obtained functional information, including regarding positional changes, from Mr. Carter.  Mr. Carter testified he could lift up to 35 pounds a few

13

times; he could stand 1 hour; he could walk 1 hour; he had no problems sitting; he could touch his toes bending from the waist; he could crouch; he could kneel by using his hands to assist, and he could roll over to get himself back up.  Mr. Carter said his condition is the same as in 2001.  Thus, he indicated his condition was the same from 2001 through the expiration of his insured status on March 31, 2005.

(Tr. 17.)

In this case, the ALJ thoroughly discussed Dr. Goldstein's opinions, gave them "significant weight," and explained his reasons for doing so.  *Muse*, 925 F.2d at 790 (citing *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.")).  The ALJ is responsible for assessing a claimant's RFC based on all of the relevant evidence in the record.  *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir. 2005); 20 C.F.R. § 404.1546(c).  If substantial evidence in the record supports an ALJ's determination of a claimant's RFC, there is no reversible error.  *See id.; Gutierrez v. Barnhart*, 2005 WL 1994289, at *7 (5th Cir. Aug. 19, 2005).  In this case, the ALJ properly considered the evidence as a whole, utilizing not only parts of Dr. Goldstein's RFC assessment, but also the other evidence in the record that included several medical records and Carter's testimony to determine Carter's RFC and the effect Carter's impairments had on his ability to work.  Even more, the ALJ appropriately discounted the portions of Dr. Goldstein's opinion that were unsupported or inconsistent with the overall evidence.  (Tr. 13-14, 17.)  *See* 20 C.F.R. § 404.1527(c) (supportability and consistency are factors for the ALJ to consider when he weighs a medical opinion); *see also Andrews v. Astrue*, 917 F. Supp. 2d 624, 642 (N.D. Tex. 2013) (with nontreating physicians' opinions, an ALJ is free to incorporate only those limitations that he finds to be consistent with the weight of the evidence as a whole).  The ALJ considered Dr. Goldstein's qualifications (Tr. 14), but he also gave specific, legitimate reasons for the weight

that he gave to Dr. Goldstein's opinion (Tr. 13-14, 17). Based on the above, it is clear that the ALJ discussed the evidence in the record in making his disability determination, adequately explained the reasoning for such determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse*, 925 F.2d at 790. Because there is substantial evidence in the record that supports the ALJ's RFC determination, the Court concludes that remand is not required.

## B. Duty to Develop the Record

Carter also argues that the ALJ had a duty to develop the record by ordering a consultative examination and that the ALJ did not satisfy that duty. (Pl.'s Br. at 1, 8-9.) In support of this argument, Carter states, "At the administrative hearing, the ALJ noted several times that the medical evidence of the record was minimal, despite what should have been a lengthy treatment history for Plaintiff's injury on May 26, 1999, through 2001." (Pl.'s Br. at 8 (citing Tr. 26, 53-56).) Further, Carter explains that "the ALJ noted at the administrative hearing that he might send Plaintiff to a consultative examination, but he would base that decision on the additional evidence to be submitted by Plaintiff's representative following the hearing." (Pl.'s Br. at 8 (citing Tr. 56).) Carter, however, concedes that, following the hearing, "the only additional evidence submitted by Plaintiff's representative . . . was Exhibit 10E, which relates to Plaintiff's worker's compensation claim." (Pl.'s Br. at 8.) Nevertheless, Carter argues that Exhibit 10E "does not relate to the three treating sources the ALJ discussed at the time of the administrative hearing, which included treatment notes from Dr. Cohen, the Smart Institute, and the Fort Worth Osteopathic Hospital." (Pl.'s Br. at 8 (citing Tr. 55).)[11] Carter further states that,

---

[11] The Court notes that such statement appears inaccurate because Exhibit 10E does contain records, as noted by the ALJ and set forth above, from Dr. Cohen and the Smart Institute. (*See, e.g.*, Tr. 15, 250-51, 258-59

"[t]hus, the ALJ's admission that he would only order a consultative examination if, after receiving the pertinent treatment notes, he deemed it necessary, and the fact that this evidence was never submitted, supports a finding that the ALJ erred by failing to fully develop the record." (Pl.'s Br. at 8-9.)

The Fifth Circuit imposes a duty on the ALJ to fully and fairly develop the facts relative to a claim for benefits.[12] *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). When the ALJ fails in this duty, he does not have before him sufficient facts on which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). "Nonetheless, reversal is appropriate only if the claimant shows that he was *prejudiced* as a result of the insufficient record." *Hudspeth v. Astrue*, No. 4:09-CV-156-Y, 2010 WL 3033891, at *12 (N.D. Tex. July 2, 2010) (emphasis added); *see Kane*, 731 F.2d at 1220. "To establish prejudice, a claimant must show that he 'could and would have adduced evidence that might have altered the result.'" *Brock*, 84 F.3d at 728 (quoting *Kane*, F.2d at 1220).

In this case, even assuming that the ALJ had a duty to further develop the record, Carter has failed to demonstrate prejudice, as he has presented no evidence suggesting that he would have or could have adduced evidence that would have altered the ALJ's decision. Even more,

---

[12] 20 C.F.R. § 404.1512(d) imposes a similar duty:

(d) Our responsibility. Before we make a determination that you are not disabled, we will develop your complete medical history *for at least the 12 months preceding the month in which you file your application* unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application. We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

20 C.F.R. § 404.1512(e) (emphasis added).

the record does not comport with Carter's allegations.  At the administrative hearing, Carter's

attorney at the time, Mr. Owen, and the ALJ discussed the limited medical records:

> ALJ:  All right.  Now are all of Mr. Carter's relevant medical records in the file,
> and in asking that, there's not a lot there.
>
> ATTY:  You're correct, judge, and I've discussed that with the claimant.  He
> understands that without medical treatment we've got an issue as far as his case is
> concerned.  But, yes, the file is complete at this time.
>
> ALJ:  All of the relevant records are there.
>
> ATTY:  That's it.
>
> ALJ:  Okay.  If they're not there, they're not there.
>
> ATTY:  And like I said, we've had that discussion, and he understands.

(Tr. 26.)  Further, because the relevant question was whether Carter was disabled from May 26,

1999 to March 31, 2005 (Tr. 9-12, 19, 118, 134, 137), the only relevant medical records that

could have been developed further were records relating to examinations or treatment occurring

before March 31, 2005,[13] which the ALJ gave Carter ample time to submit for consideration:

> ALJ:  Okay.  Mr. Owen, it looks like there's three sets of records that might be
> helpful.  We're talking about Dr. Cohen, the Smart Institute, and the Osteopathic
> Hospital.  Are there any others that you think from Mr. Carter's testimony that
> might help me?
>
> ATTY:  Those are the ones that I had written down as well, judge.
>
> ALJ:  All right.  I'd like you to submit those.  How much time do you want to
> submit them?
>
> ATTY:  My concern is with the Osteopathic Hospital records, judge, it may -- if
> they are archived or if they're in another location, it may take some time to get
> those.
>
> ALJ:  Mm-hmm.  That's what I would expect.

---

[13] *See, e.g., Dominguez v. Astrue*, 286 F. App'x 182, 185 (5th Cir. 2008) ("Evidence showing degeneration
of a condition after the expiration of a claimant's insured status is not relevant to the Commission's disability
analysis.").

ATTY:  If I could have 45 days.

ALJ:  Okay.  I'll give you suspense until March 22nd.  Obviously, the sooner you get them in, Mr. Carter's interested in getting this looked at, the better.  But I'd like you to put in the request either today or tomorrow for --

ATTY:  Yes.

ALJ:  -- those.  Will you do that?

ATTY:  Certainly.

ALJ:  And then follow up on.  Now what I may do -- I'm going to look at -- what I normally do in these cases, Mr. Carter, is I want to see the medical records first.  I may send you to a consultative exam depending upon what I see. . . .  [B]ut I normally don't do that until I've seen the medical records first because I may not need it.

(Tr. 55-56.)

The ALJ gave Carter more than six weeks to provide these additional records.  However, for reasons unknown, Carter failed to comply.  Because Carter has failed to show how he was prejudiced, the Court concludes that the ALJ did not err in failing to obtain additional evidence.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document.  The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made.  *See* 28

18

U.S.C. § 636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

### ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until May 8, 2015, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation.  It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED April 24, 2015.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE